UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| KEVIN TARVER | § | |
| | § | |
| v. | § | CIVIL NO. 4:21-CV-970-SDJ |
| | § | |
| MICHAEL HERNANDEZ, ET AL. | § | |

## **MEMORANDUM OPINION AND ORDER**

In a violent confrontation with four Denton, Texas, police officers, Darius Tarver was tased, shot, and killed. As Administrator of Tarver's estate, his father, Kevin Tarver,[1] sued the City of Denton (the "City") and Officers Michael Hernandez and Doug Downing under 42 U.S.C. § 1983 for alleged violations of Tarver's Fourth Amendment rights.

The City and the officers filed separate dismissal motions under Federal Rule of Civil Procedure 12(b)(6). (Dkt. #10, #11). The Court granted the City's motion. *See Tarver v. City of Denton*, 633 F.Supp.3d 864, 873 (E.D. Tex. 2022). At that time, the Court deferred ruling on the officers' motion pending Kevin's submission of a Rule 7(a)(7) response to the officers' qualified immunity defense. *Id.* Kevin has submitted the requested response, (Dkt. #28), and the officers replied, (Dkt. #29, #31).

After considering the officers' Motion to Dismiss, (Dkt. #11), and the parties' supplemental filings, the Court concludes that the motion should be granted.

---

[1] For clarity, the Court refers to Darius Tarver as "Tarver" and his father as "Kevin."

# I. BACKGROUND

The events underlying this suit occurred in January 2020.[2] At that time, Tarver was a twenty-three-year-old student enrolled at the University of North Texas. (Dkt. #5 ¶ 16). Sometime before the encounter, Tarver was "involved in a motor vehicle accident which resulted in a head injury and a trip to the hospital." (Dkt. #5 ¶ 17). After leaving the hospital, Tarver began acting "strangely" and "saying things that did not make sense." (Dkt. #5 ¶ 18). On January 21, 2020, Tarver's "condition deteriorated." (Dkt. #5 ¶ 19). So much so that his roommate called 911 to request medical assistance for him. (Dkt. #5 ¶ 20). Officers Michael Hernandez, Doug Downing, Latrice Pettaway, and Ryan Spivey responded to the call. (Dkt. #5 ¶ 21). They arrived after dark around 9:00 p.m. The officers' body cameras captured the tragic events that followed.

Upon arrival, the officers encountered Tarver standing at the top of a stairwell near his apartment. (Dkt. #28 ¶ 8). The stairwell was dimly lit and Tarver could only be seen by flashlight. The officers remained at the base of the stairs and

---

[2] The facts described herein are based on Kevin's Amended Complaint, (Dkt. #5), his Rule 7(a) Reply, (Dkt. #28), and the facts in the light depicted by the videotape, which Kevin incorporated by reference, (Dkt. #28 ¶ 1). *See Hartman v. Walker*, 685 F.App'x 366, 368 (5th Cir. 2017) (per curiam) (citing *Scott v. Harris*, 550 U.S. 372, 380–81, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)). The officers' body camera video provides the best evidence of the events outside Tarver's apartment on the evening of January 21, 2020. Accordingly, where Kevin's allegations depart from the video, the Court will consider the video to provide the most accurate depiction of events. *See, e.g.*, *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (noting that courts "need not rely on the plaintiff's description of the facts where the record discredits that description but should instead consider the facts in the light depicted by the videotape" (citation modified)). The Court retains a copy of the body-camera footage on its server. (Dkt. #33 ¶ 3).

unsuccessfully tried to initiate a dialogue with Tarver. This interaction lasted just over a minute.

During this time frame, and a few seconds after initiating contact, one of the officers stated that he saw something in Tarver's left hand but that he could not identify what it was. Overhearing this comment, Tarver responded, "Come up and find out." The officer ordered Tarver to "[c]ome out with [his] hands up." Tarver failed to comply and again responded: "Come up and find out." The officer repeated his order, advising that the officers "just wanted to talk to [Tarver] to figure out what was going on," but they needed Tarver to "come out and comply." Tarver again ignored the officers' order and went silent. Twice more the officers attempted to converse with Tarver, requesting that he confirm his identity. He ignored those questions too and disappeared into his apartment for the next four minutes.

Meanwhile, the officers gathered and shared intel on Tarver. They assessed how much of a threat he posed and strategized on how to proceed. One officer noted that he believed Tarver was "aggressive because he told me to come up and find out a second ago what he had [in his hand.]" The officers decided to remain at the bottom of the stairs. Officer Pettaway called Tarver's roommate and asked him what had been going on with Tarver. The roommate recounted Tarver's bizarre behavior that day—positioning pillows, mattresses, and blankets in front of various doors and windows. The roommate went on to describe Tarver's current state, noting that his "eyes [were] all bugged out." And although the roommate did not think Tarver would harm him, he believed that Tarver would "wig out" if he refused to discuss God.

3

Tarver then emerged suddenly from the apartment, holding something in his left hand. He moved to the stairwell and promptly began to descend the stairs, advancing toward the officers. Although they couldn't yet identify what Tarver had in his hand, the officers repeatedly ordered him to put it down or drop it. Tarver ignored these commands, muttering incoherently about God.

Tarver then paused halfway down the stairs. Using their flashlights, the officers identified one of the objects in Tarver's hand—a frying pan. They warned Tarver that they were going to tase him if he didn't drop it. "I'm not scared," Tarver replied. He continued descending the stairs toward the officers, rambling about God: "There is only one God. There is only one God above. There is only one God. He's my Heavenly Father. He's the real Heavenly Father. He's the real Heavenly Father." Tarver simultaneously pointed to the sky with his right arm. Although the officers continued to warn that they would tase him if he didn't drop the pan, Tarver remained undeterred. Concerned for their safety, one officer instructed the others to "back it up." They complied. Tarver then reached the ground floor, placing him fifteen feet or more from the nearest officer.[3]

Tarver remained at the bottom of the stairs for nearly thirty seconds before the officers took further action. His arms were visible, and he held the frying pan in his left hand. During this time, Officer Hernandez repeatedly commanded Tarver to drop what he was carrying, ultimately stating: "I'm going to tell you right now, drop it.

---

[3] Both Kevin and the officers describe Tarver as being fifteen feet or more from the nearest officer when he reached the bottom of the stairs. In the video he looks closer than that to the nearest officer, but the Court will assume the 15-plus foot distance recounted in Kevin's allegations and affirmed by the officers.

Drop it or I'm going to tase you. Drop it now or I'm going to tase you. Do you understand? Last time. Drop it now. Drop it." Tarver neither acknowledged nor responded to these commands.

Soon thereafter, another officer spotted a meat cleaver in Tarver's left hand.[4] "He's got a knife too," the officer states. "Yeah, I see that," another officer replies. Given this new information, the officers each identified whether they've "got lethal"— presumably a loaded firearm. At this time, Officer Hernandez announced that he was going to tase him. Officer Hernandez then commanded Tarver to "drop it" twice, and as he gave the second command Officer Hernandez tased Tarver.

The taser struck Tarver in the chest, causing him to drop the frying pan. He retained control of the meat cleaver, however, and remained upright. Tarver then lunged toward the source of the taser—Officer Hernandez. He flailed his arms wildly in that direction—meat cleaver in hand—rapidly closing the gap between them.[5] At

---

[4] In the video the officers refer to the cleaver as a "knife," as does Kevin in his submissions. However, the video shows that this is not merely a "knife," but a large meat cleaver.

[5] Although they reacted quickly to evade him, the officers report that Tarver managed to slash Officer Hernandez in the shoulder, a wound that required treatment at the hospital. Kevin responds that the video does not show that Tarver injured Officer Hernandez. The video depicts rapid and chaotic activity after Tarver was first tased and is not sufficiently clear to show the cleaver striking Officer Hernandez. But later in the video, Officer Hernandez describes his injuries. While the officers were rendering aid to Tarver, Officer Hernandez notes that Tarver "hit me in the shoulder when he had his knife." And shortly thereafter, Officer Hernandez repeats himself, noting that "[Tarver] hit me with something, I can feel it."

For purposes of resolving this motion, the Court need not conclude that Tarver wounded Officer Hernandez shortly after being tased. It is enough that the video shows, at a minimum, that Tarver slashed at Officer Hernandez with a meat cleaver after he was tased.

this moment, Officer Downing shot Tarver and Tarver fell to the ground, dropping the meat cleaver.

Once Tarver was on the ground, the officers located the meat cleaver behind his head. An officer kicked it away. But because Tarver continued to flail in place, the officers kept their distance. They commanded him to "stay down" nine times and to "not move" four times.

Ignoring these instructions, Tarver did the opposite. He rose from the ground and was "immediately tased again" by Officer Hernandez. (Dkt. #28 ¶ 28). But like the first taser, the second taser strike did not subdue Tarver. Indeed, it does not appear to have had any effect on him. Tarver moved back to the bottom of the stairwell, repeatedly shouting, "I am not scared." He grabbed the frying pan, turned toward the officers, and charged. Again, the officers retreated before taking further action. Tarver marched forward rapidly, repeating that he was "not scared." As he approached within a few feet of them, Officer Downing shot Tarver twice more. Tarver then collapsed. Although the officers rendered aid on the scene, Tarver died shortly thereafter.

All in all, six-and-a-half minutes elapsed between the officers' first contact and the final shooting, during which Tarver ignored at least thirty-six officer commands. Against this backdrop, the Court analyzes Officer Hernandez's and Officer Downing's qualified immunity defenses.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R.

CIV. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court has instructed that although a plaintiff need not establish a favorable probability that the defendant is liable, the plausibility standard demands "more than a sheer possibility." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

When assessing a motion to dismiss under Rule 12(b)(6), the facts pleaded are entitled to a presumption of truth, but legal conclusions that lack factual support are not entitled to the same presumption. *Id.* To determine whether the plaintiff has pleaded enough to "nudge his claims . . . across the line from conceivable to plausible," a court draws on its own common sense and judicial experience. *Id.* at 679–80 (citation modified). This threshold is surpassed when a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

When, as here, the defendant asserts a qualified immunity defense in a motion to dismiss, a court has an "obligation . . . to carefully scrutinize [the complaint] before subjecting public officials to the burdens of broad-reaching discovery." *Jacquez v. Procunier*, 801 F.2d 789, 791 (5th Cir. 1986); *see also Wicks v. Miss. State Emp. Servs.*, 41 F.3d 991, 995 n.16 (5th Cir. 1995) ("[I]mmunity means more than just immunity from liability; it means immunity from the burdens of defending a suit, including the burdens of pretrial discovery.").

### III. Discussion

Kevin brings this civil rights action under 42 U.S.C. § 1983 for alleged violations of Tarver's constitutional rights. Section 1983 creates a private cause of action for violations of federally secured rights under color of state law. To state a Section 1983 claim, the plaintiff must establish (1) the deprivation of a right secured by the Constitution or federal law, (2) that the deprivation occurred under color of state law, and (3) that it was caused by a state actor. *Victoria W. v. Larpenter*, 369 F.3d 475, 482 (5th Cir. 2004).

The Fourth Amendment excessive-force questions here arise in the context of a lawsuit against state officers under Section 1983, where the qualified immunity doctrine applies. Qualified immunity shields officers from suit unless their actions violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The doctrine ensures that "fear of liability will not unduly inhibit officials in the discharge of their duties." *Camreta v. Greene*, 563 U.S. 692, 705, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011) (internal quotation marks and citation omitted).

Once a defendant properly raises a qualified immunity defense, "the burden shifts to the plaintiff to demonstrate that the defendant is not entitled to the defense's protection." *Batyukova v. Doege*, 994 F.3d 717, 724 (5th Cir. 2021). To carry that burden, a plaintiff must show that (1) the official violated a federal statutory or constitutional right, and (2) the unlawfulness of the conduct was clearly established

at the time. *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021). Courts have the discretion to address either or both prongs. *Id.*

Here, Kevin asserts that Officers Hernandez and Downing—City of Denton police officers—used excessive force against Tarver, violating his Fourth Amendment rights. Both officers contend that these claims are precluded under either prong of qualified immunity. For clarity, the Court addresses both prongs.

## A. Constitutional Violations

Prong one asks whether an officer's use of force violated the Fourth Amendment.

"The touchstone of the Fourth Amendment is 'reasonableness,' as measured in objective terms." *Barnes v. Felix*, 605 U.S. 73, 79, 145 S.Ct. 1353, 221 L.Ed.2d 751 (2025) (citation modified). An officer violates the Fourth Amendment when an arrestee "suffers an injury that results directly and only from a clearly excessive and objectively unreasonable use of force." *Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020); *see also Graham v. Connor*, 490 U.S. 386, 395–96, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The question is "whether the force deployed was justified from 'the perspective of a reasonable officer on the scene[.]'" *Barnes*, 605 U.S. at 79 (quoting *Graham*, 490 U.S at 396). Courts must therefore "slosh [their] way through the factbound morass of 'reasonableness.'" *Scott v. Harris*, 550 U.S. 372, 383, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

For excessive-force claims, courts consider the *Graham* factors: (1) the severity of the suspected crime; (2) whether the suspect posed an immediate threat to the

safety of the officer or others; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S at 396. In evaluating the *Graham* factors, courts also consider "the time officers had to make decisions, whether the force used is 'measured and ascending' in accordance with the suspect's aggression, whether the suspect signaled that he was armed, and whether he moved toward or away from law enforcement." *Est. of Parker v. Mississippi Dep't of Pub. Safety*, 140 F.4th 226, 239 (5th Cir. 2025) (quoting *Singleton v. Casanova*, No. 22-50327, 2024 WL 2891900, at *5 (5th Cir. June 10, 2024)).

Reading Kevin's live complaint liberally, he claims that four separate officer actions violated Tarver's Fourth Amendment rights. First, when Officer Hernandez tased Tarver at the bottom of the stairwell.[6] Second, when Officer Downing shot Tarver after the first tasing. Third, when Officer Hernandez tased Tarver a second time. And fourth, when Officer Downing shot Tarver after the second tasing. Because the Court must "assess the reasonableness of each defendant's actions separately,"[7] it evaluates each officer's actions in turn.

---

[6] It is undisputed that Tarver was tased twice by Officer Hernandez, once at the bottom of the stairwell and again when he got up and moved to retrieve the frying pan. However, in his amended complaint Kevin's excessive-force claim appears to focus only on Officer Hernandez's first tasing of Tarver and Officer Downing's use of lethal force against Tarver. *See* (Dkt. #5). Nonetheless, the Court will read the amended complaint liberally and assume it also charges that the second tasing of Tarver forms part of the excessive-force claim.

[7] *Pratt v. Harris Cnty.*, 822 F.3d 174, 181 (5th Cir. 2016).

### 1.  Officer Hernandez

#### a.  The first tasing of Tarver

To evaluate Kevin's excessive-force claim against Officer Hernandez, the Court must examine "the facts and circumstances confronting" him when he deployed his taser, *Graham*, 490 U.S. at 397, as well as the "totality of the circumstances," *Barnes*, 605 U.S. at 80 (internal quotation marks omitted). Those facts and circumstances include the following.

Officer Hernandez and his fellow officers were responding to a 911 call from Tarver's roommate, requesting medical assistance for Tarver due to his erratic behavior. During the officers' first interaction with him, Tarver refused to converse with the officers, identify himself, or comply with several commands. Tarver spoke directly to the officers only twice, telling them to "[c]ome up and find out" what he was holding. These comments made one officer relay to the others that he believed Tarver was aggressive. When Officer Pettaway made a call to Tarver's roommate to gather more information, the roommate recounted Tarver's bizarre behavior that day—positioning pillows, mattresses, and blankets in front of various doors and windows. The roommate went on to describe Tarver's current state, noting that Tarver's "eyes [were] all bugged out," and the roommate was concerned that Tarver would "wig out."

Tarver then reappeared at the top of the stairwell and began advancing down the steps toward the officers. He was holding what the officers at first believed was just a frying pan. Fifty-one seconds elapsed before he was tased. During that period,

Tarver ignored fourteen police commands to drop what he was holding and five warnings that he would be tased. All the while, Tarver moved down the stairs toward the officers, rambling incoherently about God. Concerned for their safety, the officers retreated from the base of the stairs.

When Tarver paused at the bottom of the stairs, he continued to look around wildly, intonate about God frenetically, and ignore the officers' warnings and commands to drop what he was holding or he would be tased. During this time, an officer noted that Tarver was also holding a meat cleaver. The presence of this second weapon and Tarver's behavior, particularly his refusal to drop the cleaver and frying pan despite multiple commands to do so, left the officers with a difficult choice. They faced a mentally distressed young man who had approached them with weapons and ignored their commands. The officers each announced whether they had "lethal," and Officer Hernandez stated that he was going to tase Tarver. No officer suggested a different approach to subduing Tarver, and after again commanding Tarver to drop what he was holding, Officer Hernandez deployed his taser.

Examining the totality of the circumstances, the Court concludes that Officer Hernandez's use of force, namely his deployment of the taser, was objectively reasonable. On balance, the *Graham* factors support this conclusion.

The first factor is the severity of the suspected crime. Here, the officers were dispatched to provide Tarver with medical assistance, not to investigate a crime. The Officers were "thus equipped with the understanding that [Tarver] was likely experiencing a mental health crisis and needed medical assistance."

12

*Timpa v. Dillard*, 20 F.4th 1020, 1030 (5th Cir. 2021). This factor weighs against Officer Hernandez.

The second factor is whether the suspect posed an immediate threat to the safety of the officer and others. Tarver was unstable, noncompliant, had made threatening comments, and was armed with two deadly weapons—a meat cleaver and a frying pan—in a public area. He was commanded to drop them multiple times. Tarver refused. Instead, he continued to advance toward the officers. And although Tarver paused at the bottom of the stairs for nearly thirty seconds before he was tased, he still refused to disarm in compliance with the officers' commands and ignored their repeated warnings that he would be tased if he did not drop what he was holding.

Before deploying his taser, Officer Hernandez and his colleagues tried in multiple ways to de-escalate the situation with Tarver, who they understood to be in mental distress. The officers attempted, unsuccessfully, to communicate and negotiate with Tarver, advising Tarver at the outset that they just wanted to understand what was going on with him. Tarver's menacing response was that the officers could "[c]ome up and find out" what he was holding. Thereafter, when Tarver advanced toward the officers with two weapons, a meat cleaver and a frying pan, they repeatedly commanded him to drop these weapons and likewise repeatedly warned him that he would be tased if he failed to comply. These commands and warnings were all ignored by Tarver. Given the circumstances, including Tarver's continued erratic behavior and his threatening statement when the officers first arrived on

13

scene, Officer Hernandez reasonably believed that Tarver "pose[d] a threat of serious harm to the officer[s] or to others." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009). This factor weighs in favor of Officer Hernandez's use of force.

The third factor also weighs in favor of Officer Hernandez—whether the suspect was actively resisting arrest or attempting to evade arrest by flight. As the Fifth Circuit has explained, "[o]f the *Graham* factors, the extent of [the suspect's] resistance is the most important to analyzing [an officer's] use of his taser." *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022). When faced with an uncooperative individual, officers must use "measured and ascending actions that correspond to [the individual's] escalating verbal and physical resistance." *Joseph*, 981 F.3d at 332–33 (citation modified). Indeed, "the speed with which an officer resorts to force is relevant in determining whether that force was excessive to the need." *Trammell v. Fruge*, 868 F.3d 332, 342 (5th Cir. 2017). Also relevant is an individual's level of resistance, as the Fifth Circuit has "found tasing not excessive where a suspect 'resists arrest or fails to follow police orders' or 'resist[s]' an officer's attempt to handcuff him." *Betts*, 22 F.4th at 583 (alteration in original) (citation omitted); *see also Buchanan v. Gulfport Police Dep't*, 530 F.App'x 307, 314 (5th Cir. 2013) (per curiam) ("[W]here a suspect resists arrest or fails to follow police orders, officers do not violate his right against excessive force by deploying their tasers to subdue him.").

That said, when an individual offers merely "passive resistance or no resistance at all," an officer's use of a taser may be excessive. *See, e.g., Cloud*, 993 F.3d at 385. For example, an officer's taser use was excessive when a suspect

"had not committed a crime, attempted flight, or disobeyed any commands, and who may have only provoked police with an 'off-color joke.'" *Id.* (quoting *Newman v. Guedry*, 703 F.3d 757, 762–63 (5th Cir. 2012)). The same is true when a suspect's "resistance" is merely pulling their arm away from the arresting officer. *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013). And, of course, an officer cannot tase someone who is "facedown in the fetal position, not suspected of committing any crime, not posing a threat to officers or others, and not actively resisting arrest." *Joseph*, 981 F.3d at 342.

Under this framework, Officer Hernandez's taser use falls within the Fifth Circuit's bounds of reasonableness. Up until this point, no physical force had been used against Tarver. Although Tarver made aggressive comments and refused to comply with commands, the officers continued to issue only verbal warnings and commands. When Tarver advanced toward them with a potential weapon, the officers escalated their tone and their commands, warning him that he would be tased if he didn't drop it and stop. Only after discovering that Tarver also held a meat cleaver—a large knife—did Officer Hernandez decide to tase him.

All in all, the officers used "measured and ascending" actions in response to Tarver's non-compliance and the perceived risk he posed to them and others. *E.g.*, *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012). The officers' belated awareness of the meat cleaver in Tarver's hand shows that the situation was "tense, uncertain, and rapidly evolving." *Graham,* 490 U.S. at 397. And because Tarver had repeatedly "fail[ed] to follow police orders"—seventeen orders and five warnings that

he would be tased, to be exact—this factor weighs in favor of Officer Hernandez. *Buchanan*, 530 F.App'x at 314; *see also Betts*, 22 F.4th at 583.

With two *Graham* factors weighing in Officer Hernandez's favor, his decision to deploy the taser was reasonable.[8] Therefore, considering the totality of the circumstances, as well as governing precedent, Officer Hernandez is entitled to qualified immunity on Tarver's claim regarding the first deployment of his taser. *See, e.g.*, *Poole*, 691 F.3d at 629 (taser use reasonable when suspect "persistent[ly]" resisted arrest and ignored an officer's verbal commands); *Buchanan*, 530 F.App'x at 313–14 (noting that the officer's "multiple warnings" and the decedent's "repeated failure to comply with police instructions would be enough to overcome [the decedent's] claim of excessive force for the tasing").

For his part, Kevin makes much of the fact that, when Tarver was tased, he had paused at the bottom of the stairwell and had not physically challenged or attacked the officers. In Kevin's view, the deployment of the taser at this time was unnecessary, unreasonable, and a violation of the Fourth Amendment. Not so.

To be sure, Tarver had not physically engaged the officers at the time he was first tased. But he had ignored every officer request, command, and warning. And nothing about Tarver's behavior suggested that he could be reasoned with. At that point in time, the officers faced difficult and dangerous alternatives. They knew that Tarver was mentally unstable and agitated, that he was holding two deadly weapons

---

[8] In fact, the Fifth Circuit has found that qualified immunity applied even when "two of the *Graham* factors weigh[ed] *against* the officers." *Solis v. Serrett*, 31 F.4th 975, 983 (5th Cir. 2022) (emphasis added).

in a public area, and that he had refused all commands to disarm and made threatening comments to the officers.

Should Officer Hernandez have waited longer before tasing Tarver when he had paused at the bottom of the stairs, hoping that with additional time Tarver would become more calm or cooperative rather than more violent? Perhaps. Should Officer Hernandez have waited for more officers to arrive or attempted further communication with Tarver, or should he and his colleagues have requested the help of medically trained personnel before taking action to subdue Tarver? Perhaps. But it was also reasonable for Officer Hernandez to conclude that delay could have the opposite effect, making the situation more dangerous. Delaying any attempt to subdue the armed, mentally unwell, and non-compliant Tarver could also have resulted in Tarver becoming more agitated and assaulting the officers or otherwise harming himself or others.[9] As the Supreme Court has recognized, "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Mullenix v. Luna*, 577 U.S. 7, 17, 136 S.Ct. 305, 193 L.Ed.2d 255 (2015) (quoting *Long v. Slaton*, 508 F.3d 576, 581–82 (11th Cir. 2007)). The point being, facing dangerous alternative choices amid a

---

[9] Kevin does not suggest that Officer Hernandez or his colleagues should have attempted to physically disarm and restrain Tarver before using a taser. The omission is sensible, as there is no reason to believe this approach would have been safer under the circumstances. *See Ramirez v. Guadarrama*, 2 F.4th 506, 512–13 (5th Cir. 2021) (mem.) (Oldham, J., concurring in the denial of rehearing en banc) (rejecting plaintiffs' arguments that the officer could have tackled the decedent or waited on a crisis-intervention team because both options "would put the lie to Justice Jackson's admonition that the Constitution is not 'a suicide pact.'" (citation omitted)).

confrontational and stressful situation, Officer Hernandez's decision to use his taser was warranted under the totality of circumstances.

But even if Officer Hernandez's choice were to be viewed as a mistake, the analysis would not change. As the Supreme Court has made clear, "[t]he Fourth Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay would gravely endanger their lives or the lives of others." *City & Cnty. of S.F. v. Sheehan*, 575 U.S. 600, 612, 135 S.Ct. 1765, 191 L.Ed.2d 856 (2015) (citation modified). The Court has underscored this point, stating that "[t]his is true even when, judged with the benefit of hindsight, the officers may have made some mistakes," because "[t]he Constitution is not blind to the fact that police officers are often forced to make split-second judgments." *Id.* (citation modified); *see also Graham*, 490 U.S. at 396–97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."). Facing an armed, agitated, mentally unwell suspect who had made threatening comments and ignored police commands to drop his weapons, as well as warnings that he would be tased, it was objectively reasonable for Officer Hernandez to deploy his taser and doing so did not violate the Fourth Amendment.

### b.  The second tasing of Tarver

When Officer Hernandez first deployed his taser against Tarver, it failed to subdue Tarver. To the contrary, although Tarver dropped the frying pan after he was

tased, he maintained control of the meat cleaver he had been holding and proceeded to assault Officer Hernandez with this weapon, lunging at him and slashing with the cleaver. Indeed, Officer Hernandez later remarks on the video that Tarver wounded him with the cleaver at that time. In response, Officer Downing shot Tarver and he fell to the ground, dropping the cleaver.

At that time, the officers repeatedly commanded Tarver to stay on the ground and not to move. Tarver ignored these commands. About thirty seconds after falling to the ground, and in defiance of the officers' commands, Tarver stood up and began moving toward the frying pan, rambling about God being his "shield." Officer Hernandez tased Tarver a second time as he stood and moved toward the frying pan, but the taser had no effect on Tarver. Tarver picked up the frying pan and charged the officers, resulting in Officer Downing's second use of lethal force.

All of the *Graham* factors support Officer Hernandez's second use of his taser on Tarver. As to the first factor, the severity of the suspected crime, when Officer Hernandez deployed his taser the second time, Tarver had already assaulted him with a meat cleaver. At a minimum, Tarver's actions constituted both an assault and an assault on a public servant or peace officer under Texas law. *See* TEX. PENAL CODE ANN. § 22.01(a)(2) (West 2025) ("A person commits an offense if the person: . . . intentionally or knowingly threatens another with imminent bodily injury[.]"); *id.* § 22.01(b)(1) (third-degree felony to assault a public servant who is "lawfully discharging an official duty, or in retaliation or on account of an exercise of official power or performance of an official duty as a public servant"); *id.* § 22.01(b-2) (second-

19

degree felony to assault "a person the actor knows is a peace officer . . . while the officer . . . is lawfully discharging an official duty or in retaliation or on account of an exercise of official power or performance of an official duty as a peace officer"). The second factor, whether the suspect posed an immediate threat to the safety of the officer and others, also weighs in favor of Officer Hernandez. If there was any doubt that Tarver presented an immediate threat to the officers, the public, and himself, it was dispelled when Tarver assaulted Officer Hernandez with the meat cleaver. Although unsuccessful, Officer Hernandez's second tasing of Tarver was another attempt to subdue an unstable and dangerous suspect.

The third *Graham* factor also supports Officer Hernandez's second use of his taser—whether the suspect was actively resisting arrest or attempting to evade arrest by flight. When Officer Hernandez tased Tarver the second time, Tarver had already responded to the first attempt to subdue and restrain him by attacking Officer Hernandez with a meat cleaver. After being brought to the ground by Officer Downing's gunshot, Tarver ignored repeated police commands to stay down and not to move, standing up and moving toward the frying pan. There can be no doubt that Tarver was not only resisting arrest but doing so with potentially deadly acts of violence.

In sum, under the *Graham* factors and the totality of the circumstances, Officer Hernandez's decision to use his taser a second time against Tarver was objectively reasonable, warranted, and did not violate the Fourth Amendment.

### 2. Officer Downing

As with Officer Hernandez, the Court must review "the facts and circumstances confronting" Officer Downing when he shot Tarver, *Graham*, 490 U.S. at 397, as well as the "totality of the circumstances," *Barnes*, 605 U.S. at 80 (internal quotation marks omitted). Because the facts leading up to the first tasing are discussed in detail above, *see supra* Part III.A.1.a, the Court recaps the events just after Officer Hernandez deployed his taser.

Officer Downing shot Tarver the first time just seconds after Tarver was tased. Although Tarver convulsed and dropped the frying pan when he was struck by the taser, he quickly overcame the taser's effects, maintained control of the meat cleaver, and lunged toward Officer Hernandez, slashing at him with the cleaver.[10] When the taser failed to subdue Tarver and he assaulted Officer Hernandez with the cleaver, Officer Downing shot Tarver once in the stomach. Tarver then fell to the ground and dropped the cleaver.

Officer Downing's second shots came about thirty-five seconds later. Tarver was on the ground for most of that time, flailing and continuing to invoke God as "his shield." All the while, Tarver ignored every officer command, including nine orders to "stay down" and four orders to "not move." Tarver then suddenly got up. Although he was immediately tased a second time by Officer Hernandez, this taser strike

---

[10] Officer Downing's use of lethal force was reasonable regardless of whether Tarver wounded Officer Hernandez with the cleaver. Merely lunging toward the officers with a deadly weapon is sufficient for officers to use deadly force. *See, e.g.*, *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ("[I]f the suspect threatens the officer with a weapon . . . deadly force may be used if necessary to prevent escape[.]").

appeared to have no effect. Tarver moved back to the stairs and grabbed the frying pan. He then turned and charged the officers, who backed away. But within seconds, Tarver had closed in on them. After issuing one final order to "stay down," Officer Downing shot Tarver twice.

As the Supreme Court made clear in *Barnes*, the analysis for excessive-force claims involving deadly force still "requires analyzing the 'totality of the circumstances.'" *Barnes*, 605 U.S. at 80 (quoting *Cnty. of Los Angeles v. Mendez*, 581 U.S. 420, 427–28, 137 S.Ct. 1539, 198 L.Ed.2d 52 (2017)). "Of course, the situation at the precise time of the shooting will often be what matters most; it is, after all, the officer's choice in that moment that is under review." *Id*. That said, courts must consider the events leading up to the use of deadly force, for "'in-the-moment' facts 'cannot be hermetically sealed off from the context in which they arose.'" *Id*. (citation omitted). Put another way, "[t]he history of the interaction, as well as other past circumstances known to the officer, . . . may inform the reasonableness of the use of force." *Id*. at 80–81.

The Fifth Circuit has instructed that the use of deadly force "is not unreasonable when an officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others." *Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir. 2008) (citation modified). Courts must be careful, however, "to avoid second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Batyukova*, 994 F.3d at 725 (citation modified). That is especially true in cases involving deadly force, when officers often make "life-

or-death decisions that must be made in a few seconds in highly stressful and unpredictable circumstances." *Barnes*, 605 U.S. at 89 (Kavanaugh, J., concurring). While it's "one thing to dissect and scrutinize an officer's actions with the '20/20 vision of hindsight,' 'in the peace of a judge's chambers,'" it's another "to make 'split-second judgments' on the ground, 'in circumstances that are tense, uncertain, and rapidly evolving.'" *Id.* at 89–90 (quoting *Graham*, 490 U.S. at 396–97).

Under the *Graham* factors, the Court concludes that Officer Downing's uses of deadly force were objectively reasonable. As to the first factor—the severity of the crime—the Court notes that Tarver's actions precipitating Officer's Downing's first and second uses of lethal force, attacking a police officer with a meat cleaver and later charging officers with a frying pan, constituted both assault and assault on a public servant or peace officer under Texas law. *See* TEX. PENAL CODE ANN. § 22.01(a)(2) (West 2025) (assault); *id.* § 22.01(b)(1) (assault on a public servant); *id.* § 22.01(b-2) (assault on a peace officer); *see also supra* Part III.A.1.b. Thus, before each use of lethal force by Officer Downing, he and the other officers had witnessed Tarver commit at least one felony. The first factor weighs in Officer Downing's favor.

Turning to the second *Graham* factor, Tarver posed an immediate threat to the officers' safety both times Officer Downing shot Tarver.[11] The first time, Tarver had just lunged toward Officer Hernandez and slashed at him with a meat cleaver. Because he appeared unaffected by the taser, it's unclear what harm Tarver may

---

[11] The Fifth Circuit considers the second factor to be the most "critical" in a deadly force case. *Parker*, 140 F.4th at 240; *see also Singleton*, 2024 WL 2891900, at *12 n.17 ("When an officer uses deadly force, the second *Graham* factor is generally the most important." (citation modified)).

have caused if Officer Downing had not shot him. Considering the "past circumstances known to the officer"[12]—Tarver's erratic behavior, noncompliance with officer commands, and prior threatening comments—Officer Downing had "reason to believe that [Tarver] pose[d] a threat of serious harm to the officer[s] or others." *Ramirez*, 542 F.3d at 129 (citation modified). In short, Officer Downing's decision to shoot Tarver was exactly the type of "life-or-death decision[] that must be made in a few seconds in highly stressful and unpredictable circumstances." *Barnes*, 605 U.S. at 89 (Kavanaugh, J., concurring). The Court therefore finds that this factor favors Officer Downing for the first shooting.

The intervening events between Officer Downing's first shot and his later shots further demonstrate that Tarver remained an immediate threat. After falling to the ground as a result of Officer Downing's first shot, Tarver not only ignored all officer commands to stay down and to not move, he disobeyed them by doing the opposite: he stood up and moved to retrieve the frying pan. He then charged directly at the officers with renewed fervor, yelling that he "was not scared." Taken together with the preceding context—Tarver's continuing violent behavior, failure to comply with officer demands, and unaffected demeanor after being tased twice and shot once—Officer Downing had ample "reason to believe that [Tarver] pose[d] a threat of serious harm to the officer[s] or others." *Ramirez*, 542 F.3d at 129 (citation modified). As a result, this factor also favors Officer Downing as to the reasonableness of his second use of deadly force.

---

[12] *Barnes*, 605 U.S. at 81.

The third *Graham* factor is much the same. When Tarver was tased, it was obvious that the officers were attempting to subdue and detain him. But Tarver didn't respond by dropping his weapons, going to the ground, or allowing the officers to restrain him. Instead, Tarver retained the meat cleaver in one hand and lunged toward Officer Hernandez. If refusing to follow police orders and resisting being handcuffed constitutes resisting arrest, *e.g.*, *Betts*, 22 F.4th at 583 (quoting *Cloud*, 993 F.3d at 385), then lunging at an officer with a deadly weapon, after that officer had deployed his taser, surely is too. In short, Tarver actively resisted arrest when he responded violently to Officer Hernandez's attempt to restrain him by deploying the taser. In this regard, Kevin's amended complaint concedes that Tarver was resisting arrest. *See* (Dkt. #5 ¶ 35) ("[Tarver] then tried to resist the unlawful assault by Defendants Hernandez and Downing and was shot at least twice more by Defendant Downing.").

A similar analysis applies to Officer Downing's second use of lethal force: Tarver actively resisted arrest by ignoring commands to stop moving and to stay on the ground, by retrieving a weapon, and then charging toward the officers with that weapon. This factor also weighs in favor of the reasonableness of Officer Downing's final use of lethal force.

With all three *Graham* factors supporting the reasonableness of Officer Downing's actions, and considering the totality of circumstances preceding both shootings, the Court concludes that Officer Downing's uses of deadly force were reasonable. Officer Downing is therefore entitled to qualified immunity.

\*    \*    \*    \*

Because Kevin's excessive-force claims against Officers Hernandez and Downing fail under prong one of the qualified immunity analysis, prong two need not be addressed. However, Kevin's claims also fail under prong two.

## B. Clearly Established Law

Prong two asks whether an officer's actions violated clearly established law. *Betts*, 22 F.4th at 584. This requirement "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004); *see also Saucier v. Katz*, 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (explaining that qualified immunity operates "to protect officers from the sometimes hazy border between excessive and acceptable force" (citation modified)).

"The clearly established inquiry is demanding, especially in claims for excessive force." *Harmon v. City of Arlington*, 16 F.4th 1159, 1167 (5th Cir. 2021). Such claims often involve officers making "split-second decisions," and the "results depend 'very much on the facts of each case.'" *Id.* at 1166 (quoting *Kisela v. Hughes*, 584 U.S. 100, 104, 138 S.Ct. 1148, 200 L.Ed.2d 449 (2018) (per curiam)). Therefore, "a right is clearly established only if preexisting precedent has placed the constitutional question beyond debate."[13] *Id.* at 1165 (citation modified). In other

---

[13] The Court assumes that Fifth Circuit precedent alone can clearly establish the law. *See Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5, 142 S.Ct. 4, 211 L.Ed.2d 164 (2021) (per curiam) ("assuming" that "controlling Circuit precedent clearly establishes law for

words, the contours of the right must be "sufficiently definite [so] that any reasonable official in the [officer's] shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 779, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

When conducting this inquiry, courts must "frame the constitutional question with specificity and granularity," *Morrow v. Meachum*, 917 F.3d 870, 874–75 (5th Cir. 2019), rather than "at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011). An officer loses qualified immunity only when "the violative nature of *particular* conduct is clearly established . . . in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 577 U.S. at 12 (citation modified).

There are two ways to demonstrate clearly established law. Under the first approach, the plaintiff may "identify a case" or "body of relevant case law" in which "an officer acting under similar circumstances . . . was held to have violated the [Constitution]." *Joseph*, 981 F.3d at 330 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64, 138 S.Ct. 577, 199 L.Ed.2d 453 (2018)). This approach "do[es] not require a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. In the excessive-force context, "officers are entitled to qualified immunity unless existing

---

purposes of § 1983"); *Betts*, 22 F.4th at 585 n.6 ("We assume that circuit precedent can clearly establish law for purposes of § 1983." (citation modified)).

precedent 'squarely governs' the specific facts at issue." *Kisela*, 584 U.S. at 104 (quoting *Mullenix*, 577 U.S. at 13).

Under the second approach, "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Wesby*, 583 U.S. at 64 (quoting *Brosseau*, 543 U.S. at 199).

As with its analysis under the first prong, *see supra* Part III.A.1–2, the Court reviews each officer's actions separately.

### 1. Officer Hernandez

Even if a Fourth Amendment violation occurred, Officer Hernandez would still be entitled to qualified immunity because his taser use did not violate clearly established law. In this regard, Kevin has not met his "burden to find a case in [Tarver's] favor that does not define the law at a high level of generality." *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019) (quoting *Vann v. City of Southaven*, 884 F.3d 307, 310 (5th Cir. 2018) (per curiam)); *see also Ontiveros v. City of Rosenberg*, 564 F.3d 379, 383 n.1 (5th Cir. 2009) ("Excessive force incidents are highly fact-specific and without cases squarely on point, officers receive the protection of qualified immunity.").

To overcome Officer Hernandez's qualified immunity in this case as to the first deployment of his taser against Tarver, Kevin must show that clearly established law prohibited Officer Hernandez from using the taser against a mentally distressed, agitated person, armed with a meat cleaver and a frying pan, who had made

28

threatening comments and repeatedly ignored police commands to drop his weapons, as well as related warnings that he would be tased if he failed to comply. As to Officer Hernandez's second deployment of his taser, Kevin faces a similar burden, heightened by the fact that, when Officer Hernandez deployed his taser the second time, he did so after Tarver had assaulted him with the meat cleaver and been shot, and Tarver had then ignored officer commands to remain on the ground and stood up again.

Kevin identifies three Fifth Circuit cases that involved the use of tasers: *Joseph*, *Darden*, and *Anderson*.[14] *See* (Dkt. #21 at 8–9); (Dkt. #30 at 6–7). Taken together, Kevin believes that these cases compel the conclusion that tasing Tarver—unstable, armed, and refusing to comply with officer demands—violated clearly established law. The Court disagrees.

At the outset, the Fifth Circuit decided *Joseph* on November 20, 2020, nearly ten months after the events underlying this suit occurred. Because "the unlawfulness of the conduct [must be] 'clearly established at the time'" of the alleged violation, *Joseph* cannot clearly establish the law as to Tarver's claims. *Cloud*, 993 F.3d at 383.

But even if it could, *Joseph* is inapt: The officers there immediately resorted to tasing and striking an individual who was not suspected of committing a crime, was not armed, was experiencing a mental-health crisis, was in the fetal position, and had not offered active resistance but had merely disobeyed officer commands.

---

[14] Kevin also cites *Bush v. Strain*, 513 F.3d 492 (5th Cir. 2008), which is inapposite because it did not involve tasing, but rather involved "forcefully slamm[ing] [the plaintiff's] face into a vehicle" while "handcuffed and subdued." *See id.* at 501. These facts alone show why it could not clearly establish the law as to Officer Hernandez's tasing.

*Joseph*, 981 F.3d at 326–27, 342. By contrast, the Court has concluded that the officers here used measured and ascending actions in response to Tarver's non-compliance and the perceived risk he posed to them and others. *See supra* Part III.A.1. What's more, Kevin admits in his Rule 7(a) response that Tarver was armed with "a frying pan and knife in his left hand" as he "descended the stairs" toward the officers. (Dkt. #28 ¶ 12). *Joseph* therefore did not put Officer Hernandez's use of force beyond constitutional debate. *See Harmon*, 16 F.4th at 1165.

Moving next to *Darden*,[15] Kevin is correct that "a constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest." 880 F.3d at 731. But the facts in *Darden* cabin—or at least color—this precept.

The officers in *Darden* were investigating "claims that cocaine was being sold from a private residence." *Id.* at 725. They "broke down the front door with a battering ram, yelled that they were police, and ordered everyone to get down." *Id.* Darden "was kneeling on the seat of a couch near the door" and "immediately raised his hands in the air" when the officers entered. *Id.* Even though Darden had made no threatening gestures, an officer threw him to the ground. *Id.* at 726. And although Darden appeared to comply with officer demands, an officer "proceeded to choke Darden and to repeatedly punch and kick Darden in the face." *Id.* After that, he was tased. *Id.* Darden then pushed himself up because "he could not breathe," but he put "his hands in the air." *Id.* He was then tased "a second time." *Id.*

---

[15] *Darden v. City of Fort Worth*, 880 F.3d 722 (5th Cir. 2018).

None of the *Darden* facts resemble the circumstances at issue here. Tarver was tased only because he refused to obey police commands, was armed with two deadly weapons, was standing near the officers, and had made threatening comments. In addition, no officer imposed physical force on Tarver before Officer Hernandez deployed his taser. In short, *Darden* is inapposite—not "squarely on point." *Ontiveros*, 564 F.3d at 383 n.1.

The Fifth Circuit's gloss on *Darden* further supports the Court's conclusion. For example, the court has noted that *Darden* is "cited by every tasing plaintiff" and perhaps is "cited too much." *Cobbins v. Sollie*, No. 22-30692, 2023 WL 4015303, at *6 (5th Cir. June 14, 2023) (per curiam) (quoting *Henderson v. Harris Cnty.*, 51 F.4th 125, 134 (5th Cir. 2022)). And in *Henderson v. Harris County*, the Fifth Circuit remarked that *Darden* is an "extreme example[] that do[es] nothing to clearly establish the law for less-extreme tasings[.]" 51 F.4th at 134. Because the facts and circumstances surrounding Officer Hernandez's use of his taser to attempt to subdue Tarver are markedly different than those presented in *Darden*, Kevin is mistaken in asserting that Officer Hernandez's actions ran afoul of law "clearly established" by *Darden*.

Kevin's reliance on *Anderson v. McCaleb*, 480 F.App'x 768 (5th Cir. 2012) (per curiam), is also misplaced. *Anderson* is an unpublished decision and "cannot clearly establish the law." *See Joseph*, 981 F.3d at 341 n.105. Even looking past that, *Anderson* established at most that once a subject has been subdued, no longer poses any threat to officer safety, and is not actively resisting arrest, reasonable officers

would know that they cannot continue to beat or tase the subject. *Anderson*, 480 F.App'x at 773. But Tarver was not subdued when Officer Hernandez deployed his taser the first time or the second time. When Officer Hernandez tased him the first time Tarver was armed with two weapons and posed a palpable threat to officer safety, and when Officer Hernandez tased Tarver the second time Tarver had already assaulted him with a meat cleaver and had ignored officer commands to stay on the ground after he was shot. For the additional reason that the facts of *Anderson* are unlike the circumstances here, *Anderson* cannot "clearly establish" the law applicable to Officer Hernandez's use of force.

In sum, none of the cases Kevin cites clearly establishes that any reasonable officer in Officer Hernandez's shoes would have known that his uses of force against Tarver were unlawful. "That alone dooms his case here." *Vann*, 884 F.3d at 310.

Finally, Kevin has not argued, much less shown, that a "robust consensus of persuasive authority" exists "that defines the contours of the right in question with a high degree of particularity." *Rich*, 920 F.3d at 294 (citation modified). Nor has Kevin argued or demonstrated that this case involves an "obvious" constitutional violation by Officer Hernandez, such that Kevin "need not identify an on-point case to overcome qualified immunity[.]" *Salazar v. Molina*, 37 F.4th 278, 285 (5th Cir. 2022).

For these reasons, Officer Hernandez is entitled to qualified immunity under prong two of the inquiry.

### 2. Officer Downing

Kevin's claims against Officer Downing similarly fail because he did not carry his "burden to find a case in [Tarver's] favor that does not define the law at a high level of generality." *Rich*, 920 F.3d at 294.

To overcome Officer Downing's qualified immunity in this case as to the first use of lethal force against Tarver, Kevin must show that clearly established law prohibited Officer Downing from using lethal force when, after being tased by Officer Hernandez, Tarver maintained control of the meat clever he held and assaulted Officer Hernandez with the cleaver. Of course, such clearly established law would also need to encompass the circumstances preceding Officer Hernandez's first deployment of the taser, as described herein.

As to Officer Downing's second use of lethal force against Tarver, Kevin faces a similar burden, heightened by the following additional facts: when Officer Downing used lethal force the second time, Tarver had already (1) been brought to the ground by Officer Downing's first use of lethal force, but ignored repeated commands to stay on the ground and stood up; (2) been tased by Officer Hernandez a second time with no effect; and then (3) retrieved the frying pan he had been holding and charged the officers with it.

Kevin cites two cases involving the use of deadly force—*Batyukova* and *Romero v. City of Grapevine*, 888 F.3d 170 (5th Cir. 2018). *See* (Dkt. #21 at 7, 9); (Dkt. #30 at 6–7). The Court takes each in turn.

*Batyukova*, like *Joseph*, was decided after Tarver's encounter with the officers. It therefore cannot clearly establish the law. *See supra* Part III.B.1. Setting this aside,

33

Kevin asserts that *Batyukova* established that force may not be used when "an individual is no threat to any other individual." (Dkt. #30 at 6) (citing *Batyukova*, 994 F.3d at 727). True enough. But that's not the case here. The first time Officer Downing shot Tarver, he was assaulting Officer Hernandez with a meat cleaver. The second time Officer Downing used lethal force, Tarver was charging at the officers with a frying pan. In each circumstance, Tarver posed a threat to his own safety, the officers' safety, and the safety of those nearby, so *Batyukova* does not apply.

The analysis under Kevin's other cited authority—*Romero*—is much the same. Kevin cites *Romero* for the general proposition that the use of deadly force violates the Fourth Amendment "unless the officer has probable cause to believe that the suspect poses an immediate threat of serious physical harm, either to the officer or others." (Dkt. #30 at 6) (citing *Romero*, 888 F.3d at 176). But "broad general proposition[s]" will not do, for "the violative nature of *particular* conduct [must be] clearly established." *Mullenix*, 577 U.S. at 12 (citation modified). Moreover, as the Court noted under its analysis for *Batyukova*, Officer Downing had ample cause to believe that Tarver posed a threat of serious physical harm before each use of lethal force. At both times, Tarver, armed with a deadly weapon, was assaulting one or more police officers. And at both times, Tarver was resisting arrest. *See, e.g.*, *Flores v. Harris*, No. H-17-3817, 2019 WL 1426313, at *17 (S.D. Tex. Mar. 29, 2019) ("The majority of Fifth Circuit cases concluding that an officer's use of deadly force was objectively reasonable have involved situations in which the victim was actively

resisting arrest, ignoring verbal commands, or was identified . . . as posing a safety risk to others."). As a result, *Romero* also does not apply.

Because Kevin has not provided a case that is "squarely on point," or otherwise shown that Officer Downing violated a clearly established right, Officer Downing "receive[s] the protection of qualified immunity" under prong two. *Ontiveros*, 564 F.3d at 383 n.1.[16]

## C. Tarver's Mental Distress

The fact that Kevin's excessive-force claims arise from a violent encounter involving a person in mental distress does not alter the result here. The Court recognizes that "the legal significance of an officer's awareness of a suspect's mental health is murky." *Joseph*, 981 F.3d at 334. But the reasoning and arc of excessive-force cases involving mentally unwell suspects only confirms the conclusion that Officers Hernandez and Downing are entitled to qualified immunity.

A decade ago, in *Sheehan*, the Supreme Court considered police officers' use of deadly force to subdue a mentally ill woman during an armed confrontation. 575 U.S. at 603–06. Specifically, the Court addressed the question whether, notwithstanding the dangerous circumstances created by the mentally unwell suspect, the officers were required to "attempt[] to accommodate her disability." *Id.* at 613. Applying the second prong of the qualified immunity inquiry, the Court held that established law

---

[16] As with Officer Hernandez, as to Officer Downing, Kevin has not argued or shown that a "robust consensus of persuasive authority" exists "that defines the contours of the right in question with a high degree of particularity." *Rich*, 920 F.3d at 294 (citation modified). Nor has Kevin argued or shown that this case involves an "obvious" constitutional violation by Officer Downing, such that Kevin "need not identify an on-point case to overcome qualified immunity[.]" *Salazar*, 37 F.4th at 285.

as of 2008 did not require officers to accommodate a suspect's mental illness. "If anything, the opposite may be true." *Id.* at 617. At that time, the Supreme Court cited with approval cases from several circuits upholding the application of qualified immunity in excessive-force cases involving mentally ill subjects who posed a danger to themselves, officers, or the public. *See id.* (first citing *Bates v. Chesterfield Cnty.*, 216 F.3d 367, 372 (4th Cir. 2000) ("Knowledge of a person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public."), then citing *Sanders v. Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007) (same), and then citing *Menuel v. Atlanta*, 25 F.3d 990 (11th Cir. 1994) (upholding use of deadly force to try to apprehend a mentally ill man who had a knife and was hiding behind a door)).

In another case decided only months after *Sheehan*, the Supreme Court cited with approval an Eleventh Circuit decision, *Long v. Slaton*, 508 F.3d 576 (11th Cir. 2007), involving the use of lethal force against a mentally ill suspect. *See Mullenix*, 577 U.S. at 17. In *Long*, the Eleventh Circuit held "that a sheriff's deputy did not violate the Fourth Amendment by fatally shooting a mentally unstable individual who was attempting to flee in the deputy's car, even though at the time of the shooting the individual had not yet operated the cruiser dangerously." *Id.* The Supreme Court highlighted with approval the *Long* court's explanation for its decision: "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Id.* (quoting *Long*, 508 F.3d at 581–82).

*Sheehan* and *Mullenix* endorse two related principles of importance to the qualified immunity inquiry here. The first is that police officers confronting a tense situation with an armed suspect are not required to wait for the suspect to use a deadly weapon before taking preemptive action to subdue the suspect. The second is that police officers are not required to alter their approach to such circumstances when the suspect is mentally unwell.

Since *Sheehan* and *Mullenix* were decided, neither Supreme Court nor Fifth Circuit precedent departs from the sensible lessons of those cases. Nor is there any precedent binding on this Court that "clearly establishes" a requirement to accommodate the mental disability of a suspect under otherwise dangerous circumstances rendering the use of force, including lethal force, reasonable. To the contrary, more recent decisions from the Supreme Court and persuasive decisions from other courts are consistent with *Sheehan* and *Mullenix*.

For example, a few years after *Sheehan*, in *Kisela*, the Supreme Court considered a case involving the non-fatal shooting of a mentally unwell suspect by a law enforcement officer. 584 U.S. at 101–02. The Court recounted the circumstances of the confrontation that precipitated the shooting: a knife-armed, threatening suspect, whose bizarre behavior had been called into 911, and who disobeyed officer commands to disarm for up to one minute before the officer felt compelled to shoot. *Id.* at 105–06. The Court concluded, "[t]his is far from an obvious case in which any competent officer would have known that shooting [the suspect] to protect [a third party] would violate the Fourth Amendment." *Id*. The same is true here, where

37

Officers Hernandez and Downing, responding to a 911 call, confronted a threatening, non-compliant suspect armed with two deadly weapons. Indeed, in this case—unlike *Kisela*—the officers initially attempted to subdue Tarver through the use of non-lethal force. Accordingly, the rationale for granting qualified immunity in *Kisela* applies with even greater force here.

Similarly, in *Frederick v. Motsinger*, 873 F.3d 641 (8th Cir. 2017), the Eighth Circuit considered a case involving a fatal encounter between several police officers and a mentally unwell woman. *Id.* at 643–45. After officers were called to a convenience store in Rogers, Arkansas, they encountered the suspect, Fallon Frederick, who was "holding a four-inch folding knife and erratically pacing back and forth." *Id.* at 643. Frederick, who identified herself as a "paranoid schizophrenic," and who was later determined to have been under the influence of methamphetamine at the time, refused to comply with one officer's repeated commands to drop the knife, which resulted in another officer discharging his taser at her. *Id.* at 643–45. Frederick blocked one of the taser probes with her purse, was not subdued, and "charged the officers." *Id.* at 643. A third officer then shot and killed her. *Id.*

A lawsuit followed, which included claims against both the officer who tased Frederick and the officer who shot her. *Id.* The district court held that the officers were objectively reasonable in tasing Frederick and then shooting her when she charged them, and that the officers were entitled to qualified immunity because they had not violated Frederick's clearly established Fourth Amendment rights. *Id.* at 645. On appeal, no argument was made that it was objectively unreasonable to use deadly

force against a suspect "who was charging a fellow officer with a knife raised in a stabbing position." *Id*. at 646. Nonetheless, in dicta the Eighth Circuit commented that its "prior cases support[ed] the district court's conclusion" that the "use of deadly force in this situation was reasonable." *Id*.

However, on appeal Frederick's estate "vigorously pursued" the argument that the attempted tasing of her was objectively unreasonable and violated her clearly established Fourth Amendment rights. *Id*. The Eighth Circuit rejected this argument and upheld the district court's decision. The court's analysis is instructive. The Eighth Circuit began its discussion by noting that "[n]umerous cases have upheld use of tasers to control potentially violent, defiant detainees who pose a safety risk to the officers or others, particularly when the officer warns that a taser will be used," as the tasing officer did in *Frederick*. *Id*. The court went on to agree with the district court that the tasing officer's decision to use non-lethal force, his taser, in an attempt to disarm Frederick "after she refused repeated warnings to drop a four-inch knife," was objectively reasonable. *Id*. at 647; *see also id*. (explaining that "Frederick was in a small commercial space, in front of restrooms that might have been occupied, and brandishing a weapon that posed a danger to the officers and store customers").

In reaching this conclusion, the court was unpersuaded by the argument that, because Fredrick had not "directly threatened" the officers with her knife before being tased, the deployment of the taser was unreasonable. Rejecting this argument, the Eighth Circuit noted that Frederick "was acting erratically, expressing irrational thoughts, holding a knife in a stabbing position, challenging the officers' authority,

and disobeying commands to drop her knife." *Id*. And, "[w]hile Frederick did not lunge at the officers prior to being tased, [the officers] reasonably perceived she was ready to use her knife against them or others." *Id*. Comparing the case to *Scott v. Harris*, the Eighth Circuit concluded that "'it is clear from the videotape that [Frederick] posed an actual and imminent threat' of harm to the officers and others in the store." *Id*. (quoting *Scott*, 550 U.S. at 384). "The officers did not need to wait until Frederick attacked them. '[I]t is reasonable for police to move quickly if delay would gravely endanger their lives or the lives of others.'" *Id*. (quoting *Sheehan*, 575 U.S. at 612). Citing several prior cases involving encounters with mentally ill suspects, the court went on to explain that, "[e]ven if [Frederick] was suffering from mental illness or other impairment, the relevant inquiry is whether she posed a threat, not what prompted her threatening conduct." *Id*.

The Eighth Circuit also agreed with the district court that the officers were entitled to qualified immunity because "it was certainly not clearly established that tasing a person standing in a public area who refused several commands to drop a knife would violate that person's constitutional rights." *Id*. (internal quotation marks omitted).

The *Frederick* decision, involving a fact pattern similar to the instant case, is consistent with the Supreme Court's guidance in *Sheehan*, *Mullenix*, and *Kisela*. The Court understands that guidance to confirm that, when law enforcement officers confront mentally distressed suspects, they are not hamstrung from employing appropriate force, including lethal force, when a non-compliant, armed suspect poses

a threat to himself, the officers, or others. Nor are officers expected or required under the Fourth Amendment to somehow "accommodate" a mentally unwell suspect under such circumstances, or to wait for the suspect to use a deadly weapon, before taking action to subdue the suspect. Kevin has not pointed to any Fifth Circuit precedent, and the Court is unaware of any such precedent, that departs from these lessons of *Sheehan*, *Mullenix*, and *Kisela*.

*    *    *    *

Officers Hernandez and Downing are entitled to qualified immunity under both prongs of the qualified immunity inquiry because their uses of force were reasonable and did not violate a clearly established right. Kevin's claims must be dismissed.

## IV. CONCLUSION

**T**he officers' Motion to Dismiss, (Dkt. #11), is **GRANTED**.

It is therefore **ORDERED** that all claims against Officers Hernandez and Downing are **DISMISSED with prejudice**.

The Court will enter a final judgment by separate order.

**So ORDERED and SIGNED this 5th day of January, 2026.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE